09-0994-cv (Lead)
Ognibene, et al. v. Parkes, et al.

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

October Term 2010

(Argued: October 18, 2010          Decided: December 21, 2011)

Docket Nos. 09-0994-cv (Lead) 09-1432-cv (Con)

————————————————————

TOM OGNIBENE, YVETTE VELAZQUEZ BENNETT, VIVIANA VAZQUEZ-HERNANDEZ, MARTIN DILAN, MARLENE TAPPER, ROBERT PEREZ, FRAN REITER, SHEILA ANDERSEN-RICCI, MARTINA FRANCA ASSOCIATES, LLC, REITER/BEGUN ASSOCIATES, LLC, DENIS GITTENS, OSCAR PEREZ, KING'S COUNTY COMMITTEE OF THE NEW YORK STATE CONSERVATIVE PARTY, and NEW YORK STATE CONSERVATIVE PARTY,
*Plaintiffs-Appellants*,

-v.-

JOSEPH P. PARKES, S.J., in his official capacity as Chairman of the New York City Campaign Finance Board, DALE C. CHRISTIANSEN, JR., in his official capacity as Member of the New York City Campaign Finance Board, KATHERYN C. PATTERSON, in her official capacity as Member of the New York City Campaign Finance Board, MARK S. PIAZZA, in his official capacity as Member of the New York City Campaign Finance Board, MARK DAVIES, in his official capacity as Executive Director of the New York City Conflicts of Interests Board, MONICA BLUM, in her official capacity as Member of the New York City Conflicts of Interests Board, STEVEN ROSENFELD, in his official capacity as Member of the New York City Conflicts of Interests Board, ANDREW IRVING, in his official capacity as Member of the New York City Conflicts of Interests Board, ANGELA M. FREYRE, in her official capacity as Member of the New York City Conflicts of Interests Board, and MICHAEL McSWEENY, in his official capacity as Acting City Clerk of New York City,
*Defendants-Appellees*.

————————————————————

1

Before:    LIVINGSTON, CALABRESI, *Circuit Judges*, and Crotty, *District Judge.**

Plaintiffs-Appellants[1] brought this action in February 2008 against the Defendants-Appellees,[2] challenging the constitutionality of certain provisions of New York City's political campaign finance and lobby laws that (1) limit campaign contributions by individuals and entities that have business dealings with the City; (2) exclude such contributions from matching with public funds under the public financing scheme; and (3) expand the prohibition on corporate contributions to include partnerships, LLCs, and LLPs.  Plaintiffs appeal from a February 6, 2009 decision of the United States District Court for the Southern District of New York (Swain, J.) granting the Defendants' motion for summary judgment.  We affirm the district court's dismissal of Plaintiffs' challenges as to all three provisions.

Affirmed.

---

[*] The Honorable Paul A. Crotty, District Judge of the United States District Court for the Southern District of New York, sitting by designation.

[1] Plaintiffs include New York City voters, aspiring candidates for local office, a business owner, lobbyists and individuals associated with lobbyists, limited liability companies, and political parties.
[2] Defendants are members of New York City's Campaign Finance Board and other City representatives.

JAMES BOPP, JR., Bopp, Coleson & Bostrom, Terre Haute, IN, *for Plaintiffs-Appellants*.

JANE L. GORDON, Senior Counsel (Edward F.X. Hart, Jonathan Pines, Lisa F. Grumet, Andrew J. Rauchberg, *on the brief*), Corporation Counsel of the City of New York, New York, NY, *for Defendants-Appellees*.

PAUL A. CROTTY, *District Judge*:

Appellants seek declaratory and injunctive relief, alleging that recently-enacted amendments to the New York City Administrative Code, commonly known as the "pay-to-play" rules, violate the First Amendment to the U.S. Constitution by unduly burdening protected political speech and association, the Fourteenth Amendment by denying equal protection of the laws, and the Voting Rights Act, 42 U.S.C. § 1973.[3] The challenged provisions (1) reduce below the generally-applicable campaign contribution limits the amounts that people who have business dealings with the City, including lobbyists, can contribute to political campaigns, N.Y.C. Admin. Code § 3-703(1-a) (for candidates who participate in the City's optional public financing program, set forth in N.Y.C. Admin. Code § 3-703 ("participating candidates")), 3-719(2)(b) (for candidates who do not participate in this program ("non-participating candidates")); (2) deny

---

[3] The complaint alleges that these provisions are unconstitutional, both facially and as applied. The opinion below considered only the facial challenges. See Ognibene v. Parkes, 599 F. Supp. 2d 434, 438, 461 (S.D.N.Y. 2009).

matching funds for contributions by people who have business dealings with the City and certain people associated with lobbyists, N.Y.C. Admin. Code §§ 3-702(3), 3-703(1-a); and (3) extend the existing prohibition on corporate contributions to partnerships, LLCs, and LLPs, N.Y.C. Admin. Code §§ 3-703(1)(l) (for participating candidates), 3-719(2)(b) (for non-participating candidates). Appellants argue, inter alia, that the lack of evidence of actual pay-to-play corruption in City politics means that there is no legitimate interest to be protected; that the regular contribution limits already in place sufficiently address any possible interest in reducing actual or perceived corruption; and that Citizens United v. Federal Election Commission, 130 S. Ct. 876 (2010) prohibits all contribution limits based on the source's identity. The district court rejected appellants' arguments and dismissed the claims on summary judgment.[4] We affirm as to all three provisions, finding that the laws are closely drawn to address the significant governmental interest in reducing corruption or the appearance thereof.

## I. Facts

In 1988, after a recent wave of local scandals, the New York City Council passed the Campaign Finance Act ("CFA"), establishing the Campaign Finance

---

[4] The district court decision predates Citizens United, so it did not consider this third argument.

4

Program ("Program"). (A-819.) The Campaign Finance Board ("Board") administers the Program and provides public matching funds to candidates running for the three citywide offices of Mayor, Comptroller, Public Advocate; the five offices of Borough President; and the fifty-two offices of the City Council. The CFA imposes certain obligations on all candidates, including the filing of financial disclosure statements reporting contributions and expenditures, limitations on the amount of contributions from any single donor, and the obligation to respond to the Board's requests to verify compliance with the Program. N.Y.C. Admin. Code § 3-701, et seq. The CFA also limits per-person contributions for all covered elections in a single calendar year to $4,950 for Mayor, Comptroller, or Public Advocate; $3,850 for Borough President; and $2,750 for City Council.[5] Id. § 3-703(1)(f).

Additionally, candidates who seek to participate in the public financing system must agree to limitations on the total amount of money the campaign spends promoting the candidate's nomination or election. A participating candidate's campaign receives public matching funds for all eligible individual private contributions from New York City residents of up to $175 at a rate of six dollars in public funds for every one dollar in private contributions. Id. §§ 3-703,

---

[5] Pursuant to Administrative Code § 3-703(7), these figures were increased in 2002 to reflect changes in the Consumer Price Index.

3-705(1), (2).  Contributions from organizations, however, including unions and Political Action Committees ("PACs"), are not eligible for matching.  Id. § 3-702(3)

In 1998, the New York City Charter Revisions Commission ("Commission") sought to resolve problems that the existing law did not address. (A-314-A-316.) It proposed, and the City's voters passed by referendum, a Charter amendment that directed the Board to prohibit corporate contributions for all participating candidates; required these candidates to disclose contributions from individuals and organizations doing business with the City; and directed the Board to promulgate rules fleshing out these "doing business" limitations. N.Y.C. Charter § 1052(11)(a), (12)(a).  In its recommendation, the Commission identified concerns about contractor and lobbyist contributions, but noted the lack of evidence that such contributions had actually influenced the award of a particular contract or passage of a bill.  Report of the New York City Charter Revision Commission 12-13 (Aug. 20, 1998) ("1998 Commission Report"). Nevertheless, the Commission concluded that there was "no doubt that these contributions have a negative impact on the public because they promote the perception that one must 'pay-to-play.'"  Id. at 19.  The City Council later enacted a separate ban on corporate contributions to all candidates, including non-participating candidates.

In 2006, after several public hearings and studies, the Board reported that over twenty percent of the contributions in the 2001 and 2005 election cycles were from individuals and entities doing business with the City, who comprised only five percent of contributors, and that large contributions were more likely than small contributions to come from such donors. N.Y.C. Campaign Fin. Bd., Interim Report on "Doing Business" Contributions 12, 13 (June 19, 2006) ("Interim Report"). In addition, incumbents–considered to have greater influence on city decisions–were more likely to receive these large donations than challengers. N.Y.C. Campaign Fin. Bd., Public Dollars for the Public Good: A Report on the 2005 Elections 122 (2006) ("2005 Election Report"). In order to improve the CFA, the Board recommended banning all organizational contributions (including partnerships, LLCs, PACs, and unions) and regulating contributions by individuals and entities doing business with the City. 2005 Election Report, 120, 122.

That year, the City passed Local Laws 15 and 17, which created a mandatory electronic filing system for lobbyists; required full lobbyist disclosure of all fundraising and consulting activities; banned all gifts from lobbyists to City Officials; and excluded contributions from lobbyists and the individuals identified on their statements of registration from the definition of "matchable contribution." N.Y.C. Admin. Code §§ 3-213, 3-216.1, 3-225, 3-702(3)(g). This

7

latter category of exclusions includes the lobbyist's spouse or domestic partner and, if the lobbyist is an organization, any officer or employee who engages in lobbying activity, as well as his or her spouse or domestic partner.

In 2007, the City Council voted 44-4 to pass Local Law 34, requiring disclosure of, and restricting contributions from, individuals and entities who have business dealings with the City, as defined in the CFA. The law lowers these donors' contribution limits approximately twelve-fold, to $400 (from the generally-applicable level of $4,950) for the three City-wide offices; to $320 (from $3,850) for Borough offices; and to $250 (from $2,750) for City Council.[6] The law also makes these contributions ineligible for public matching, and extends the ban on corporate contributions to LLCs, LLPs, and partnerships. Id. §§ 3-703(1)(l), 3-703(1-a), 3-719(2)(b). The corresponding City Council Committee Report referred to the Board's 2005 Election Report and stated that,

> [w]hile there is nothing intrinsically wrong with contributions from those doing business with the City, the ability of such individuals to contribute could create a perception, regardless of whether such perception is accurate, that such individuals have a higher level of access to the City's elected officials. It is important to eradicate this perception and reduce the appearance of undue influence associated with contributions from individuals doing business with the City.

---

[6] These lower limits are not indexed for inflation. See N.Y.C. Admin. Code § 3-703(7).

(N.Y.C. Council, Comm. on Gov'tal Affairs, Report of the Governmental Affairs Division, for Int. No. 586-2007 24-25 (June 12, 2007) ("Committee Report").) The Committee Report explained that the expansion of the corporate contribution ban addressed a "loophole" that allowed similarly structured business entities to circumvent the contribution limits.

The "doing business" limits apply to contributions from any natural person who is a chief executive officer, chief financial officer, and/or chief operating officer; serves in a senior managerial or equivalent capacity; or has an interest exceeding ten percent in an entity that has "business dealings" with the City or affiliate agency, unless that person is the candidate or a relative. N.Y.C. Admin. Code § 3-703(1-a). "Business dealings" include: (1) contracts greater than or equal to $100,000 for the procurement of goods, services, or construction; (2) real property acquisitions or dispositions; (3) applications for approval of transactions involving office space, land use, or zoning changes; (4) certain concessions and franchises greater than or equal to $100,000; (5) grants greater than or equal to $100,000; (6) economic development agreements; (7) contracts for investment of pension funds; and (8) transactions with lobbyists.[7] Id. § 3-702(18).

---

[7] Contracts and concessions awarded through publicly-advertised competitive sealed bidding, as well as emergency contracts, are excluded from the calculation. N.Y.C. Admin. Code § 3-702(18)(a)(i). Separate rules govern transactions providing affordable housing. Id. § 3-702(18)(a).

9

Section 3-702 of the Administrative Code contains two definitions of "lobbyist": The first is narrow, referencing § 3-211's definition of "every person or organization retained, employed or designated by any client to engage in lobbying." The second is broader, encompassing anyone included in § 3-211, as well as the lobbyist's spouse or domestic partner; unemancipated children; and, for entities, the organization's officers and employees who engage in lobbying or work for a division of the organization that engages in lobbying activities and their family members.[8] Id. § 3-702(16). Appellees concede that the narrower definition applies to the doing business limitations, even though the broader definition has been used in the past.[9] (Appellee's Br. 11 n.5). Contributions from individuals who are affiliated with lobbyists (i.e., included in the broader definition) are ineligible for matching even if they are not, under the narrower lobbyist definition, subject to the lower "doing business" limits.

As of June 30, 2008, New York City agencies (excluding affiliated entities) held 19,578 open contracts worth approximately $55.4 billion. (Simpson Decl. ¶ 5). A wide range of for-profit and non-profit entities qualify as having business dealings with the City, including Con Edison, Waste Management of New York

---

[8] All of these individuals must be included in the lobbyist's statement of registration. Id. § 3-213(c)(1).

[9] This interpretation is supported by the language of § 3-702(18), which, in defining "business dealings," provides that a lobbyist as defined by § 3-211 engages in business dealings.

LLC, the New York City Ballet, the Legal Aid Society, the Brooklyn Botanic Garden Corporation, various health and social services providers, day care centers, religious organizations, and labor organizations. See generally Doing Business Portal, http://www.nyc.gov/html/doingbiz/home.html (last visited Aug, 10, 2011). Although several labor organizations and union-affiliated entities have business dealings on account of procurement contracts with the City, "collective bargaining with City employee unions is a distinct process that is governed by State law." (Simpson Decl. ¶ 8). As a result, the procurement rules (and, consequently, the "doing business" limits) do not apply to collective bargaining with City unions or to employer-employee relationship for non-unionized employees. (Id.)

Appellants filed an original and amended complaint in February 2008 and, in April 2008, moved for a preliminary injunction on some of the claims asserted, raising facial challenges to these three provisions. After the district court postponed the hearing on injunctive relief until the trial on the merits, the Appellees moved for summary judgment. The parties then stipulated that there was no need for an evidentiary proceeding in connection with the motions. Several amicus curiae briefs were filed in support of Appellees, both by public interest organizations and by City Council candidates.

11

## II. The District Court Decision on Motion for Summary Judgment

By Order dated February 6, 2009, the district court denied Appellants' motion for injunctive relief and granted Appellee's motion for summary judgment on the same grounds: that the challenged limits served a sufficiently important governmental interest–addressing the reasonable concern about actual and apparent corruption by those doing business with the City. While there was no recent evidence of actual corruption with respect to campaign contributions, the district court reasoned, given the public's perception of continuing corruption, fueled by actual pay-to-play scandals in the 1980s, the City properly imposed the challenged limits to combat corruption, correct misperceptions, and instill public confidence in the City's political and governmental processes. 599 F. Supp. 2d at 445-46. The court also found that the contribution limits were closely drawn to respond to this interest in eliminating actual and apparent corruption, rejecting Appellants' arguments concerning the failure to index for inflation and viewpoint discrimination. Id. at 454-55.

The district court subjected the non-matching provisions to the same analysis and concluded that they were permissible. Id. at 456. It reasoned that the legislature should not be required to use taxpayer dollars to match contributions it has determined present a risk of corruption. (Id.) The court also held that using the broader definition of lobbyist does not render these provisions overbroad because this expanded reach is necessary to prevent circumvention of the contribution limits. (Id. at 457.)

12

Finally, the district court upheld the ban on contributions from partnerships, LLCs, and LLPs for the same reasons that justify prohibiting corporate contributions, specifically, to prevent circumvention of the valid contribution limits and the use of business forms to deploy for political ends business assets amassed for business reasons. (Id. at 459-60.) The court also rejected the argument that this prohibition is overbroad, underinclusive, or overinclusive.

## III. Analysis

## A. Standard of Review

A circuit court reviews a district court's grant of summary judgment de novo. Weinstock v. Columbia Univ., 224 F.3d 33, 40 (2d Cir. 2000). The Court should affirm an order granting summary judgment "only when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." Riegel v. Medtronic, Inc., 451 F.3d 104, 108 (2d Cir. 2006). The parties here agree that these motions present no issue of material fact.

The party requesting permanent injunctive relief must demonstrate (1) irreparable harm (here, a constitutional violation) and (2) likelihood of actual success on the merits. Cartier v. Symbolix, Inc., 454 F. Supp. 2d 175, 186 (S.D.N.Y. 2006); see also New York ex rel. Spitzer v. Operation Rescue Nat'l, 273 F.3d 184, 193 (2d Cir. 2001) (applying this standard to its review of a

13

decision on a preliminary injunction). Denials of injunctive relief, like grants of summary judgment, are reviewed de novo when they concern rights under the First and Fourteenth Amendments. See Ferris v. Cuevas, 118 F.3d 122, 125 & n.3 (2d Cir. 1997); Nat'l Awareness Found. v. Abrams, 50 F.3d 1159, 1164 (2d Cir. 1995). In such cases, "an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 499 (1984) (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 284-86 (1964)).

## B. Applicable Legal Standards

The Government bears the burden of justifying its contribution limits in light of a facial challenge. Nixon v. Shrink Missouri Gov't PAC, 528 U.S. 382, 387-88 (2000).

The judiciary owes special deference to legislative determinations regarding campaign contribution restrictions. See, e.g., Fed. Election Comm'n v. Beaumont, 539 U.S. 146, 155 (2003); McConnell v. Fed. Election Comm'n, 540 U.S. 93, 137 (2003). While paying deference, the judiciary must also protect the fundamental First Amendment interest in political speech. In evaluating constraints on such speech and related activity, Buckley v.

14

Valeo distinguished between campaign expenditures and campaign contributions. 424 U.S. 1 (1976). Strict scrutiny applies to restraints on the former, while limits on the latter are more leniently reviewed because they pose only indirect constraints on speech and associational rights. See Beaumont, 539 U.S. at 161-62 (holding that restrictions on the activity of contributing to a candidate's campaign are "merely 'marginal' speech restrictions subject to relatively complaisant review"); Fed. Election Comm'n v. Colo. Republicans, 533 U.S. 431, 440 (2001); Buckley, 424 U.S. at 20-21. For this reason, contribution limits and bans are permissible as long as they are closely drawn to address a sufficiently important state interest. See, e.g., Davis v. Fed. Election Comm'n, 554 U.S. 724, 737 (2008); Beaumont, 539 U.S. at 161; Buckley, 424 U.S. at 25; Green Party of Conn. v. Garfield, 616 F.3d 189 (2d Cir. 2010).

In certain cases, however, contribution restrictions may severely impact political dialogue, for example by preventing "candidates and political committees from amassing the resources necessary for effective advocacy." Buckley, 424 U.S. at 21. This question focuses on differences in kind, rather than of degree. Id. at 30. A showing of special justification is required for such restrictions to be closely drawn. See Randall v. Sorrell, 548 U.S. 230, 261 (2006).

15

The Supreme Court has consistently held that the prevention of actual and perceived corruption qualifies as a sufficiently important state interest. See, e.g., McConnell, 540 U.S. at 143; Shrink Missouri, 528 U.S. at 390; Buckley, 424 U.S. at 30; see also Davis, 554 U.S. at 740-41 (noting that the use of personal campaign funds, as opposed to contributions, actually reduces the threat of corruption). It is not necessary to produce evidence of actual corruption to demonstrate the sufficiently important interest in preventing the appearance of corruption. See McConnell, 540 U.S. at 150. On the other hand, "mere conjecture" is insufficient. See Shrink Missouri, 528 U.S. at 392. That is, the threat of corruption cannot be "illusory." Buckley, 424 U.S. at 27. "The quantum of empirical evidence needed to satisfy heightened judicial scrutiny . . . will vary up or down with the novelty and plausibility of the justification raised." Id.

This Court must consider three important decisions that have issued subsequent to the district court's opinion: Citizens United v. Federal Election Commission, 130 S. Ct. 876 (2010); Arizona Free Enterprise Club's Freedom Club PAC v. Bennett, 131 S. Ct. 2806 (2011); Green Party of Connecticut v. Garfield, 616 F.3d 189 (2d Cir. 2010).

In Citizens United, the Supreme Court held that the government cannot prohibit independent expenditures in support of a political candidate

16

based on the source's corporate identity. 130 S. Ct. 876. Contrary to Appellants' exhortations, however, Citizens United applies only to independent corporate expenditures. It reaffirms existing precedent on the propriety of contribution limits. It therefore has no impact on the issues before us in this case:

> [U]nlike limits on independent expenditures, [contribution limits] have been an accepted means to prevent quid pro quo corruption. Citizens United has not made direct contributions to candidates, and it has not suggested that the Court should reconsider whether contribution limits should be subject to rigorous First Amendment scrutiny.

Citizens United v. Fed. Election Comm'n, 130 S. Ct. 876 (2010) (citations omitted). Citizens United confirmed the continued validity of contribution limits, noting that they most effectively address the legitimate governmental interest, identified by Buckley, in preventing actual or perceived corruption. Id. at 909-10 (quoting the standard of Fed. Election Comm'n v. Nat'l Right to Work Comm., 459 U.S. 197 (1982)); see also In re Cao, Nos. 10-30080 & 10-30146, 2010 U.S. App. LEXIS 19056, *9 (5th Cir. 2010) (holding that Citizens United applies to independent campaign expenditures and has no relevance to contribution limits). Indeed, the Court reiterated that the wealth amassed by corporations and business interests is more effectively used to obligate legislators when spent on contributions, rather than independent

17

expenditures, over which the candidate has less control. See Citizens United, 130 S. Ct. at 908-09.

Since the Supreme Court preserved the distinction between expenditures and contributions, there is no basis for Appellants' attempt to broaden Citizens United. Appellants' selective and misleading quotes carefully skip over the Court's clear distinction between limits on expenditures and limits on contributions.[10] (See, e.g., Reply Br. 3). The Supreme Court has repeatedly stated that the Circuit Courts are to apply the law as it exists, unless it is expressly overruled. See Agostini v. Felton, 521 U.S. 203, 237 (1997) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." (quoting Rodriguez de Quijas v. Shearson/Am. Exp., Inc., 490 U.S. 477, 484 (1989)). Citizens

[10] Appellants argue that the anti-influence theory is not sufficient to justify contribution limits, quoting from Citizens United: "Reliance on a generic favoritism or influence theory is at odds with standard First Amendment analysis because it is unbounded and susceptible to no limiting principle." 130 S. Ct. at 910 (internal quotations omitted). But the Court made clear that it was dealing with independent corporate expenditures, not with limits or even bans on campaign contributions (or the source of contributions). Appellants twist Buckley so that it is only applicable to quid pro quo corruption. But quid pro quo is already covered by bribery laws. Instead, Buckley expressly approves restrictions on campaign contributions to facilitate the prevention of all actual and apparent corruption.

18

United left Buckley intact, and it is not for this Court to stretch Citizens United.

After handing down Citizens United, the Supreme Court invalidated an Arizona public financing scheme under which public matching funds were triggered by a privately financed candidate's level of expenditures. Bennett, 131 S. Ct. 2806. Arizona gives publicly financed candidates an initial allotment of public funds to begin their campaigns. Under the challenged law, if a privately financed, opposing candidate's expenditures (combined with independent expenditures in support of the privately financed candidate and opposed to the publicly financed candidate) exceeded the amount of this initial outlay, the publicly financed candidate received a proportionate amount of additional matching funds, up to twice the initial amount. Id. at 2814-15.

The Supreme Court determined that the provision posed a "markedly more significant burden" than the Millionaire's Amendment struck down in Davis v. Federal Election Commission, 128 S. Ct. 2759, particularly because it effectively punished the nonparticipating candidate for spending his own money on his own campaign. Bennett, 131 S. Ct. at 2819. The Court repeated its holding that there is no compelling state interest in leveling the playing field, id. at 2825; and concluded that Arizona's proffered interest in

19

preventing corruption and its appearance did not justify the burden posed on a candidate's expenditures of his own funds. Id. at 2826.[11]

Bennett binds us, but for reasons we explain later, it does not control the outcome in this case. Bennet reaffirmed several key holdings: (1) that the lower closely drawn standard applies to contribution limits, 131 S. Ct. at 2817; (2) that preventing corruption and its appearance is a compelling state interest, id. at 2825; and (3) that public financing is still a valid means of funding political candidacy. Id. at 2828.

In addition, this Court recently struck down the State of Connecticut's ban on lobbyist contributions. Green Party, 616 F.3d 189. The Court found that there was "insufficient evidence to infer that all contributions made by state lobbyists give rise to an appearance of corruption." Id. at 206 (emphasis in original). It reasoned that an outright ban was not closely drawn because a limit would have effectively addressed the appearance of corruption created

---

[11] We flatly reject Appellants' argument, submitted in its June 28, 2011 letter, that "Justice Kagan, writing in dissent in [Bennett], opines that contribution limits are ineffective at preventing corruption." This is a misciting of Justice Kagan's opinion. She does not draw the conclusion that contribution limits are per se ineffective. Rather, she poses a hypothetical in which two States are "plagued by a corrupt political system" in which "candidates for public office accept large campaign contributions in exchange for the promise that, after assuming office, they will rank the donors' interests ahead of all others." Bennett, 131 S. Ct. at 2829 (Kagan, J., dissenting). In such dire circumstances, contribution limits alone may be insufficient and easily circumvented through bundling, requiring further regulation. The Court notes that, under Green Party, such a history of actual corruption would merit an outright ban on troublesome contributions. This does not mean that contribution limits are always ineffective; they may adequately address less drastic circumstances. For this reason, the relevant analysis requires that the remedy be closely drawn.

20

by lobbyist contributions. Id. at 207 & n.15 (noting that because Connecticut's recent corruption scandals "in no way implicated lobbyists," "a limit on lobbyist contributions would adequately address the state's interest in combating corruption and the appearance of corruption on the part of lobbyists" (emphasis in original)). Implicit in the Court's reasoning is the determination that a recent history of corruption is not required for limits to pass constitutional review.

Green Party sustained a ban on contributions from state contractors because they had been implicated in a series of recent scandals. Id. at 204-05. While a limit may address the actual and perceived corruption, it does not entirely eliminate it because some exchange of money is still allowed. When the appearance of corruption is particularly strong due to recent scandals, therefore, a ban may be appropriate.

Appellants urge us to expand Citizens United, Bennett, and Green Party to invalidate the three provisions they challenge. We conclude, however, that their arguments do not comport with the express language and reasoning of these opinions.

## C. "Doing Business" Contribution Limit

The doing business limitations have three characteristics that place them outside the scope of Citizens United and Green Party: First, they deal

21

with contributions (as opposed to expenditures). Second, they are limits (as opposed to outright bans). Third, they address the appearance of corruption (as opposed to the appearance of influence). The doing business limitations are only indirect constraints on protected speech and associational rights; they are not subject to strict scrutiny but rather to the more lenient, closely drawn standard of review. In addition, the heightened evidentiary requirement urged by Appellants does not apply.[12]

Citizens United confirms, yet again, that eliminating corruption or the appearance thereof is a sufficiently important governmental interest to justify the use of closely drawn restrictions on campaign contributions. This interest

---

[12] The doing business limits differ from the generally applicable limits in degree, not in kind. Appellants argue that the limits hinder candidates' ability to amass contributions from business interests, but that is the purpose of the law. Appellants make no argument that these provisions pose unusual constraints on candidates' fundraising or contributor's associational rights. Whether the contribution limits hinder the ability to amass contributions from business interests is not the relevant test. Rather, the test is whether candidates have access to sufficient funds to run campaigns where they can effectively engage with the electorate. The data indicate that the challenged provisions actually have such a positive effect on fundraising ability. See CFB Analysis: Fundraising Shows New Focus on Small Contributions During 2008 1, 2 (2008), available at http://www.nyccfb.info/press/news/press_releases/2008-07-24.pdf (finding that "candidates for City office in the 2009 elections are raising funds at an unprecedented rate" and that "small contributors are starting to play a greater role in City campaigns"). Appellants also fail in their attempt to fit this case into Davis v. Federal Election Commission, which rejected different expenditure limits for different candidates, not donation limits for different contributors. Davis, 554 U.S. at 737-38. Even if this particular doing business limit may be called novel, as Appellants argue, the justification for it–to reduce the appearance of corruption–is not. Restrictions on contractor contributions are not uncommon and the notion that money and governmental favors are connected is far from implausible. See, e.g., N.Y. Elec. L. 14-114(9) (limiting contributions to candidates for and members of the New York City Board of Estimate by persons with a matter pending before the Board six months before and twelve months after) (repealed by 1997 Sess. L. News of N.Y. Ch. 128 (A. 7887) upon abolition of the Board of Estimate); Green Party, 616 F.3d 189; Blount v. S.E.C., 61 F.3d 938 (D.C. Cir. 1995); Fed. Election Comm'n v. Weinstein, 462 F. Supp. 243 (S.D.N.Y. 1978). Under Shrink Missouri, therefore, the quantum of empirical evidence needed is not particularly high.

exists even where there is no actual corruption, because the perception of corruption, or of opportunities for corruption, threatens the public's faith in democracy. See Fed. Election Comm. v. Colo. Republicans, 533 U.S. 431, 440-41 (2001); Buckley, 424 U.S. at 24. In fact, as noted in Green Party, while a limit may be sufficient to address actual corruption, the appearance and public perception of corruption may be so grave as to merit a ban.

Although Citizens United stated that mere influence or access to elected officials is insufficient to justify a ban on independent corporate expenditures, improper or undue influence presumably still qualifies as a form of corruption.[13] See Bennett, 131 S. Ct. at 2827 (discussing the "interest in alleviating the corrupting influence of large contributions" served by contribution limits (emphasis added) (quoting Buckley, 424 U.S. at 55)); Colo. Republicans, 533 U.S. at 440-41 ("[L]imits on contributions are more clearly justified by a link to political corruption than limits on other kinds of unlimited political spending are (corruption being understood not only as quid pro quo agreements, but also as undue influence on an officeholder's

---

[13] In any event, the Supreme Court's reservation about preventing mere influence as a justification is limited to independent expenditures. Citizens United, 130 S. Ct. at 910. The Court asserted that the appearance of influence in that context will not cause the electorate to lose faith because, by definition, independent expenditures are intended to appeal directly to these voters, reinforcing the paramountcy of their (as opposed to the source of funds') influence in the process. Id. Whatever may be said about this explanation, it clearly does not apply to contribution limits, which directly benefit the candidate and only indirectly persuade the voters.

23

judgment, and the appearance of such influence).” (citations omitted) (emphasis added)); <u>Republican Nat’l Comm. v. Fed. Election Comm’n</u>, 698 F. Supp. 2d 150, 158-60 (D.D.C. 2010).  Improper or undue influences includes both traditional <u>quid</u> <u>pro</u> <u>quo</u> and more discreet exchanges of money for favorable outcomes.[14]

While independent corporate campaign expenditures may influence a candidate, or facilitate access that non-speakers may not enjoy, <u>Citizens United</u> emphasized the right to speech and its independence from the candidate.  Direct giving to the candidate, or the candidate’s campaign committee, stands on a different footing.  Since neither candidate nor contributor is likely to announce a <u>quid</u> <u>pro</u> <u>quo</u>, the appearance of corruption has always been an accepted justification for a campaign contribution limitations.  See <u>McCormick v. United States</u>, 500 U.S. 257, 272-73 (1991) (holding that an elected official’s receipt of a campaign contribution amounts to extortion only when an official asserts that his official conduct will be controlled by the terms of the promise or undertaking, but noting that the implicit exchange of benefit for money “in a very real sense is unavoidable so

_____

[14] The distinction between mere influence or access, as addressed by <u>Citizens United</u>, and improper influence or access goes to the very heart of representative democracy.  It is one thing to gain access to a legislator in order to influence him or her with a policy argument.  Indeed, we presume that legislators are influenced by the ideological views of their constituents.  It is entirely different to seek to influence a legislator with money in the hope of receiving a contract; such influence is <u>de facto</u> improper and corrupting.

long as election campaigns are financed by private contributions or expenditures"). In other words, because the scope of quid pro quo corruption can never be reliably ascertained, the legislature may regulate certain indicators of such corruption or its appearance, such as when donors make large contributions because they have business with the City, hope to do business with the City, or are expending money on behalf of others who do business with the City.

Furthermore, such donations certainly feed the public perception of quid pro quo corruption, and this alone justifies limitations or perhaps an outright ban. 130 S. Ct. at 908, 910. When those who do business with the government or lobby for various interests give disproportionately large contributions to incumbents, regardless of their ideological positions, it is no wonder that the perception arises that the contributions are made with the hope or expectation that the donors will receive contracts and other favors in exchange for these contributions. The threat of quid pro quo corruption in such cases is common sense and far from illusory. See, e.g., NCRL v. Bartlett, 168 F.3d 705 (4th Cir. 1999) (upholding prohibition on in-session lobbyist contributions); Blount v. S.E.C., 61 F.3d 938 (D.C. Cir. 1995) (upholding SEC Rule that prohibits municipal securities brokers and dealers from engaging in municipal securities business for two years after contributing more than $250

25

to state officials from whom they obtain business); cf. United States v. Harriss, 347 U.S. 612 (1954) (dismissing a First Amendment challenge to a lobbying disclosure act).

Indeed, the Supreme Court recently attributed the particular threat of corruption posed by campaign contributions to the risk of mixing money and politics. Bennett, 131 S. Ct. at 2826 (observing that "the use of personal funds reduces the candidate's dependence on outside contributions and thereby counteracts the coercive pressures and attendant risks of abuse' of money in politics" (quoting Buckley, 424 U.S. at 53)). Doing business contributions mix money and politics on both ends of the equation, making them that much more risky and questionable. Contributions to candidates for City office from persons with a particularly direct financial interest in these officials' policy decisions pose a heightened risk of actual and apparent corruption, and merit heightened government regulation. Mere access or influence based on independent corporate speech, therefore, is not the concern here. This is so even though the record occasionally also speaks to the presence of mere "influence."

Appellants argue that Green Party requires evidence of recent scandals in order to justify any contribution restriction, not just a ban. (See Letter of July 14, 2010). This is not what Green Party says. There is no reason to

26

require the legislature to experience the very problem it fears before taking appropriate prophylactic measures. See Citizens United, 189 S. Ct. at 908 (noting the preventative nature of contribution limits because the scope of quid pro quo corruption "'can never be reliably ascertained'" and those instances that are known are covered by bribery laws (quoting Buckley, 424 U.S. at 27)); see also Anthony W. Crowell, New Lobbying Laws: More Sunlight, More Teeth, 12 CityLaw 73, 73 (July/Aug. 2006) (noting that recent Washington scandals involving lobbyist Jack Abramoff, former Representative Randy Cunningham, and Representative William Jefferson "illustrate the potential for corrupt lobbying to erode citizens' faith in their government" and that New York City enacted reforms, including making lobbyist contributions ineligible for matching with public funds, to enhance integrity and transparency in municipal government, "[r]ather than waiting for New York City to see its own lobbyist scandals"). Appellants essentially propose giving every corruptor at least one chance to corrupt before anything can be done, but this dog is not entitled to a bite. Green Party only considered whether an outright contribution ban was closely drawn to the anti-corruption interest. As to limits, Green Party set the justificatory burden somewhere between a concrete showing of actual quid pro quo

27

corruption and the sort of "mere conjecture" that the Supreme Court has deemed out of bounds. Shrink Missouri, 528 U.S. at 379.

Indeed, as the district court reasoned, Ognibene, 599 F. Supp. 2d at 448 n.12, to require evidence of actual scandals for contribution limits would conflate the interest in preventing actual corruption with the separate interest in preventing apparent corruption. In other words, if every case of apparent corruption required a showing of actual corruption, then the former would simply be a subset of the latter, and the prevention of actual corruption would be the only legitimate state interest for contribution limits. Green Party is consistent with Supreme Court precedent rejecting this argument, due to the difficulty of detecting actual corruption and the equal importance of eliminating apparent corruption. See McConnell, 540 U.S. at 153; Buckley, 424 U.S. at 27.

Appellants do not dispute that the generally applicable contribution limits responded to actual pay-to-play scandals in New York City in the 1980's. (Appellant Br. 4-5.) Rather, they argue that these initial limits have been successful, so that lower limits are unnecessary. This determination, however, is a matter of policy better suited for the legislature, which has institutional expertise in the field of election regulation and effectively curbed these scandals in the first place. See, e.g., Randall, 548 U.S. at 248 ("[W]e

28

have no scalpel to probe each possible contribution level. We cannot determine with any degree of exactitude the precise restriction necessary to carry out the statute's legitimate objectives. In practice, the legislature is better equipped to make such empirical judgments, as legislators have particular expertise in matters related to the costs and nature of running for office. Thus ordinarily we have deferred to the legislature's determination of such matters." (internal citations and quotations omitted)); Fed. Election Comm'n v. Nat'l Conservative Political Action Comm., 470 U.S. 480, 500 (1985) (noting Buckley's "deference to a congressional determination of the need for a prophylactic rule where the evil of potential corruption had long been recognized"); Fed. Election Comm'n v. Nat'l Right to Work Comm., 459 U.S. 197, 210 (1982). There is no doubt that the threat of corruption or its appearance is heightened when contributors have business dealings with the City, for the reasons just discussed. Accordingly, it is reasonable and appropriate to further limit their contributions.

In addition, it is clear that the City Council properly studied this issue before concluding that doing business contributions are particularly problematic and merit special treatment. The record contains several reports and investigations–including the 1998 Commission Report, the 2005 Election Report, the 2006 interim report of a study conducted by students at New York

29

University's Wagner Graduate School of Public Service, and the Committee on Governmental Operations' Reports on the challenged laws–all of which attest to the significant role that "doing business" contributions play in elections and in the public perception of corruption. For example, "doing business" contributors were more likely to give large rather than small donations, and disproportionately contributed to incumbents–who are considered to have greater influence on city decisions–than to challengers. 2005 Election Report, 122; see also Pines Decl., Ex. II, Deposition of Martin Malave Dilan at 33-34 (testifying that contributors who do business with the City favor incumbent candidates); Pines Decl., Ex. NN, Deposition of Marlene J. Tapper at 63 (same); Pines Decl., Ex. OO, Deposition of Viviana Vazquez-Hernandez at 44 (same). In 2001 and 2005 respectively, donors with business dealings were 3.8% and 5.3% of all contributors, but accounted for 25.2% and 21.5% of dollars contributed. Based on this evidence, it was entirely appropriate for the Council to find that there is an appearance that larger contributions are made to secure the contract, land use approval, or whatever municipal benefit is at issue.

Moreover, there <u>is</u> direct evidence of a public perception of corruption.[15] While Appellants pretend to be skeptical, their assertions are not credible. Not only is the connection between money and municipal action objectively reasonable, but their own deposition testimony confirms that the public perceives this connection to exist. <u>See, e.g.</u>, Pines Decl., Ex. II, Deposition of Martin Malave Dilan at 33-34; Pines Decl., Ex. JJ, Deposition of Thomas V. Ognibene at 31-32; Pines Decl., Ex. LL, Deposition of Fran Reiter at 52; Pines

---

[15] Although <u>Green Party</u> does not require actual incidents of corruption to sustain contribution limits (as opposed to bans), 616 F.3d at 207 & n.15, it is no wonder there is a public perception of corruption, given the recent scandals involving exchanges of money for favors. <u>See, e.g.</u>, Nicholas Confessore & Danny Hakim, <u>Bruno is Guilty of Corruption in Federal Case</u>, N.Y. Times, Dec. 8, 2009, at A1; Kareem Fahim, <u>Seeking Free Home, Ex-Legislator Will Get a Prison Cell Instead</u>, N.Y. Times (June 13, 2008), <u>available at</u> http://www.nytimes.com/2008/06/13/nyregion/13gordon.html; John Kifner, <u>Velella, Bronx Powerhouse, is Sentenced to a Year in Jail</u>, N.Y. Times, June 22, 2004, at B10; Colin Moynihan, <u>State Senator and 7 Others Plead Not Guilty to Corruption</u>, N.Y. Times, Apr. 12, 2011, at A22; Stacey Stowe, <u>Rowland Home After Serving 10 Months in Corruption Case</u>, N.Y. Times (Feb. 14, 2006), <u>available at</u> http://www.nytimes.com/2006/02/14/nyregion/14rowland.html?ref=johngrowland. No great logical leap is necessary to infer that opportunities for further, campaign-related corruption should be minimized. Moreover, several recent scandals have specifically involved pay-to-play campaign donations. <u>See, e.g.</u>, Danny Hakim & William K. Rashbaum, <u>Hevesi Pleads Guilty in Pension Case</u>, N.Y. Times, Oct. 7, 2010 (reporting on former New York State Comptroller's approval of a pension investment in exchange for, <u>inter alia</u>, $500,000 in campaign contributions); Tom Precious, <u>Scandal Over Downstate Casino Jolts Albany</u>, Buffalo News, Oct. 22, 2010; <u>see also</u> Nicholas Confessore, <u>Albany Inquiry Ends in Penalty for a Lobbyist</u>, N.Y. Times, Dec. 8, 2010, <u>available at</u> http://www.nytimes.com/2010/12/09/nyregion/09lobby.html (implicating a lobbyist in the same Comptroller's pay-to-play scheme).

All of these incidents occurred in the New York State area. While none implicates an elected New York City official, the public is not as parsing as Appellants would hope. The City Council need not wait for this outbreak to infect its own members, so that the public may specifically lose faith in that legislative body, as well. Ranging from before 2006–when the first of the challenged laws passed–to the present, these scandals have created a climate of distrust that feeds the already-established public perception of corruption. Appellants argue that the City may, in defending the law, rely only on those scandals that predate it. To consider only the scandals that predate the law would lead to an absurd result in cases, unlike this one, where a history of actual corruption is required (<u>e.g.</u>, a ban): If the law were struck down as a result, the Council could immediately pass the exact same law, citing the exact same scandals which now would be prior to the passage of the law, and that law would be upheld.

Decl., Ex. NN, Deposition of Marlene J. Tapper at 63; Pines Decl., Ex. OO, Deposition of Viviana Vazquez-Hernandez at 43-44. Appellant Tom Ognibene acknowledges the usual public perception of office holders and candidates for office: "You're all a bunch of crooks." (Pines Decl., Ex. JJ, Deposition of Thomas V. Ognibene at 32). The fact that City voters passed the referendum approving these reforms speaks powerfully to the public perception that further regulation of campaign contributions by those who do business with the City is needed.[16] See Shrink Missouri, 528 U.S. at 393-94 ("And although majority votes do not, as such, defeat First Amendment protections, the statewide vote on Proposition A certainly attested to the perception relied upon here . . . ."). In these circumstances, where people believe that many public officials are corrupt, and there is substantial and material evidence to support that belief, clearly the public may enact preventative measures to address the contaminating belief that everything is for sale and to restore faith in the integrity of the political process.

---

[16] Appellants argue that the question posed in the 1998 Referendum–whether "requiring disclosure and regulation of contributions by those doing business with the City of New York should be adopted"–was misleadingly worded because it implies that such contributions were not already regulated. The plain inference to be drawn from this question, however, is whether such contributions should be further regulated and separately disclosed, not simply as a contribution but as a contribution from one who does business with the City. Indeed, this question was well-crafted to pinpoint the propriety of "doing business" as a measure of potential corruption.

Appellants assert several rationales for why these provisions are not closely drawn. First, they assert that they are overbroad because they ban legitimate as well as corrupt acts. Buckley expressly rejected a similar argument because "[n]ot only is it difficult to isolate suspect contributions, but more importantly, Congress was justified in concluding that the interest in safeguarding against the appearance of impropriety requires that the opportunity for abuse inherent in the process of raising large monetary contributions be eliminated." 424 U.S. at 29-30, 27-28 (also noting that "laws making criminal the giving and taking of bribes deal with only the most blatant and specific attempts of those with money to influence governmental action"); see also Ward v. Rock Against Racism, 491 U.S. 781, 798 (1989) (holding that a regulation of protected speech may be narrowly tailored even if it is not the least restrictive or least intrusive means). These provisions aim at eliminating, not only corrupt acts, but the appearance of corruption. They are not overbroad. Rather, the limits are tailored to apply only to those who seek a benefit from the City; and, even then, only to those business dealings more likely linked to corruption (i.e., high value business transactions, and lobbyists, whose sole purpose is to influence City outcomes).

Appellants also argue that these restrictions are underinclusive because they do not apply to all contributors with the influence and incentive

33

to engage in pay-to-play, specifically labor organizations and neighborhood associations that do not have procurement contracts which qualify as business dealings (e.g., the Little League that wants a park to play its baseball games, contending with a soccer league that wants the same park at the same time). A statute is not, however, "invalid under the Constitution because it might have gone farther than it did." Buckley, 424 U.S. at 105; see also Blount, 61 F.3d at 946 ("Because the primary purpose of underinclusiveness analysis is simply to ensure that the proffered state interest actually underlies the law, a rule is struck for underinclusiveness only if it cannot fairly be said to advance any genuinely substantial governmental interest" (internal quotations and citations omitted)). The fact that the City has chosen to focus on one aspect of quid pro quo corruption, rather than every conceivable instance, does not render its rationale a "challenge to the credulous." Republican Party of Minnesota v. White, 536 U.S. 765, 778 (2002). The limits decided upon are not unreasonable and appear to be based on common sense. They focus on misconduct that flows from business dealings with the City and include labor organizations and neighborhood associations that do business with the City.[17] In the 2001 and

---

[17] Furthermore, labor unions are different. Unlike contractors, they are the statutory representatives of a group of municipal employees and, as such, are allowed under State law to bargain collectively and to obtain contracts. If it cannot negotiate a contract, one will be imposed by

2005 election cycles, groups defined as "doing business" with the City gave a total of about $25 million to citywide candidates while unions and labor-related PACs gave only about $4.1 million or sixteen percent of that total. (LaRue Decl. Ex. E, New York Times, <u>New Campaign Finance Rules Skip Unions</u>, June, 28, 2007.) Accordingly, the City Council's choice of definition for "business dealings" effectively captures the biggest contributors. The provisions are not, therefore, underinclusive of their stated purpose.

Appellants additionally contend that these provisions are overinclusive because they may be applied using the broader definition of "lobbyist." Appellees concede, however, that the narrower definition applies. (Appellee's Br. 11 n.5). This narrower definition comports with, and is no broader than necessary to address, the interest in eliminating actual and perceived corruption. Appellants acknowledge that the public perceives lobbyists as influencing or attempting to influence elected officials through their campaign contributions. (<u>See</u> Pines Decl., Ex. LL, Deposition of Fran Reiter at 52; Pines Decl., Ex. NN, Deposition of Viviana Vazquez-Hernandez at 44.) Accordingly, the inclusion of people and organizations engaged in lobbying activities does not render these provisions overinclusive.

---

an impasse panel. To the extent that they do business in the sense that others do, they are included in the lower limits.

Appellants further assert that these provisions are poorly tailored because they are not indexed for inflation and discriminate based on viewpoint. The mere failure to index for inflation, however, does not compel a finding that the provisions are not closely drawn. Randall pointed to the failure to index for inflation as only one of five factors which, taken together, led to its conclusion that certain contribution limits violated the First Amendment. See 548 U.S. at 253-263 (also weighing the fact that the limits applied to contributions by political parties and included volunteers' expenses). But the real problem in Randall was that the limits were so low that a candidate could not communicate meaningfully with constituents. But limits challenged here apply only to certain contributions and for citywide elections; and they are not as "suspiciously low" as those in Randall. Id. at 261; see also Green Party, 616 F.3d at 205 (noting that a limit of $50 per election would effectively address the problem of actual corruption without "wholly extinguish[ing] a contractor's actual associational rights"). Appellants do not provide any evidence that the reduced dollar amount which can be contributed prevents the running of a competitive campaign. Furthermore, Randall was concerned that such low limits would "magnify the advantages of incumbency to the point where they put challengers to a significant disadvantage." 548 U.S. at 248. The doing business limits here,

36

however, have the opposite effect; they seek to avoid stacking the deck in favor of incumbents, to whom donors with business dealings disproportionately contribute.

Viewpoint discrimination is a subset of content discrimination in which the government impermissibly targets, not the subject matter itself, but rather particular views taken on the subject. See Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829, 831 (1995); Make the Road by Walking, Inc. v. Turner, 378 F.3d 133, 150 (2d Cir. 2004). Appellants argue that the challenged provisions discriminate based on viewpoint because neighborhood, community, and labor organizations, which are not necessarily subject to the doing business limitations, share a significantly different viewpoint than do business owners and members of management. Appellants have failed, however, to offer any evidence that these organizations share a single viewpoint.[18] While a neighborhood association may have a different mission than a construction business, their interests may be precisely aligned on a particular project. It also does not follow that all neighborhood associations are monolithic. What flies in Bedford-Stuyvesant may not work in Harlem, and what works on Park Avenue may not work on the Bronx

---

[18] We do not consider Mr. Ognibene's unsupported estimation that ninety-nine percent of union contributions go to Democratic candidates to be sufficient evidence of viewpoint discrimination. (See Pines Decl. Ex. JJ, at 12.)

Champs-Elysees–the Grand Concourse. Since Appellants do not specify what these viewpoints are, it is difficult to say what is being excluded. But the experience in New York dictates the conclusion that neighborhood, community, and labor organizations do not share a single viewpoint. Nor do business owners.[19]

## D. Non-Matching Provisions

Sections 3-702(3) and 3-703(1-a) exclude contributions from individuals subject to the lower doing business limits, including lobbyists, as well as contributions from any other person required to be included in a lobbyists' statement of registration from the matching provisions of the public financing scheme. Non-matching does not prevent someone from making a contribution, but it does minimize the value of that contribution. In this respect, it is similar to a limit and subject to the less stringent standard of review. For the reasons discussed, the non-matching provision is closely drawn to address a sufficiently important governmental interest.

The public financing scheme generously matches eligible contributions of up to $175 using tax dollars at the rate of 6 to 1. The program encourages small, individual contributions, and is consistent with Randall's interest in

_____

[19] Appellants' facial Fourteenth Amendment challenge that the provisions effect impermissible viewpoint discrimination fails for the same reason.

discouraging the entrenchment of incumbent candidates.  See Randall, 548 U.S. at 248; Crowell, supra, at 77 (noting the public financing scheme's "purpose of encouraging grassroots fundraising and diminishing the influence of special interests").  When participation is voluntary and public money is used, stricter restrictions may be imposed, perhaps even restrictions that would normally be impermissible.  See Davis, 554 U.S. at 739-40.  Candidates who choose not to participate, and their contributors, are not prevented from freely expressing their political speech and associations; the legislature has merely decided not to amplify their contributions with tax dollars.  That decision is entirely permissible.  Buckley held that Congress "may engage in public financing of election campaigns and may condition acceptance of public funds on an agreement by the candidate to abide by specified expenditure limitations."  424 U.S. at 57 n.65; see Bennett, 131 S. Ct. at 2828.  As in Buckley, "by forgoing public financing, . . . [the candidates here] retain the unfettered right" to receive contributions within the limits from lobbyists, persons associated with lobbyists, and other individuals with business dealings with the City.  Davis, 554 U.S. at 739.

The matching provision at issue here is clearly distinguishable.  First, it applies to contribution limits, which the Supreme Court has recognized to be less onerous restrictions on speech than campaign expenditure limits.

39

Second, while the matching provisions here may burden the candidates who choose to participate in the public financing scheme, the provision in <u>Bennett</u> substantially burdened nonparticipating candidates, effectively forcing them to put money in their opponent's campaign coffers. <u>Id.</u> at 2819. Third, unlike the provisions challenged in <u>Bennett</u> and <u>Davis</u>, New York City's scheme does not impose different limits on different candidates. <u>Davis</u>, 554 U.S. at 738 ("We have never upheld the constitutionality of a law that imposes different contribution limits for candidates who are competing against each other.") Certain contributors—those with direct financial stakes in the elected candidate's decisions—are treated differently, <u>see</u> <u>infra</u> Part III.D; but the way in which these contributors are treated differently is the same for all candidates.

Additionally, the use of the broader definition of lobbyist for non-matching purposes does not render it overinclusive. Insofar as the provision reaches some contributors peripheral to the business dealings, such as a lobbyist's secretary or spouse, it does so only to prevent circumvention and does not form "a substantial portion of the burden on speech." <u>Turner Broadcasting System, Inc. v. F.C.C.</u>, 512 U.S. 622, 682 (1994) (quoting <u>Ward</u>, 491 U.S. at 798); Interim Report, at 30 (providing examples of how "a contribution through a spouse with the same last name is one potential way

40

to circumvent donation limits while guaranteeing the contribution is associated with the family name"). Otherwise, lobbyists will continue to do what they are doing now–giving money.[20] Indeed, use of the broader definition for non-matching purposes combats circumvention, while use of the narrower definition of lobbyist for the lower contribution limits avoids infringing the speech of people not actually engaged in lobbying activities. This distinction is an appropriate balancing of these competing concerns.

## E. Entity Ban

The Supreme Court has held that "the degree of scrutiny turns on the nature of the activity regulated," not on the fact that contributions are outright banned, as opposed to just limited. Beaumont, 539 U.S. at 161-62. Accordingly, the more lenient standard of review also applies to the entity ban. On the other hand, the analysis of whether a restriction imposes a ban or merely a limit is relevant to the closely drawn analysis. See Green Party, 319 F.3d at 206-07.

---

[20] For example, a plaintiff in this proceeding, who is the spouse of a lobbyist, testified that she had no knowledge of a contribution made jointly on her and her husband's behalf to a candidate who is unknown to her. See Pines Decl., Ex. GG, Deposition of Sheila Andersen-Ricci at 8 ("Q: Have you ever made [or directed anyone to make] any contributions to any candidates for political office in your lifetime? A: No."), 32-33 ("Q: To the best of your understanding who is Thomas White? A: I don't know.); Horowitz Decl. ¶ 4 (discussing a check drawn on the account of Ms. Andersen-Ricci and her husband, payable to "Friends of Tom White, Jr.," in the amount of $500–twice the limit for a single contribution).

Beaumont recognized four justifications for the federal ban on corporate contributions: (1) the anti-corruption interest already discussed, 539 U.S. at 154; (2) the anti-distortion interest, stemming from the "special characteristics of the corporate structure that threaten the integrity of the political process . . . [by] permit[ting] them to use resources amassed in the economic marketplace to obtain an unfair advantage in the political marketplace," id. at 153-54 (internal quotations omitted); (3) the dissenting-shareholder interest in protecting individuals' investments in the corporation from being used to support political candidates these individuals might oppose, id. at 154; and (4) the anti-circumvention interest in preventing the evasion of valid contribution limits. Id. at 155. Since the anti-corruption and anti-circumvention interests adequately justify the entity ban, we do not consider the extent to which the other rationales may apply.[21]

---

[21] Citizens United preserves the anti-corruption justification for regulating corporate contributions, based on its clear distinction between expenditures and contributions, and the lack of an express rejection of the corporate ban, which has existed since the first federal campaign finance law in 1907. 1998 Commission Report, 16. The Court is aware of United States v. Danielczyk, No. 1:11cr85 (JCC), 2011 WL 2161794 (E.D. Va. May 26, 2011), which struck down a ban on corporate contributions, based on what it called an "inescapable" expansion of Citizen United's logic. Id. at *18; Danielczyk, 2011 WL 2268063 (E.D. Va. June 7, 2011) (denying reconsideration). The role of an appellate court is to apply to law as it exists. Since the Supreme Court reaffirmed the validity of the 100-year old corporate ban just 8 years ago, Beaumont, 539 U.S. at 154-55, and declined to overrule this holding in Citizens United, this Court will not do so here. Indeed, Citizens United confirms that the anti-corruption interest is a legitimate justification for campaign contribution restrictions.

Citizens United also does not disturb the validity of the anti-circumvention interest. See Thalheimer v. City of San Diego, Nos. 10-55322, 10-55324, 10-55434, 2011 WL 2400779, at *13 (9th Cir. Jun. 9, 2011) (concluding that "nothing in the explicit holdings or broad reasoning" of Citizens United invalidates the anti-circumvention interest in the context of contribution limits); Minn. Citizens Concerned for Life, Inc. v. Swanson, 640 F.3d 304, 318 (8th Cir. 2011), vacated on July 12,

The anti-corruption rationale presents a sufficiently important governmental interest for the reasons already discussed, and applies equally to LLCs, LLPs, and partnerships, as to corporations. In addition, the organizational form of an LLC, LLP, and partnership, like a corporation, creates the opportunity for an individual donor to circumvent valid contribution limits.[22] See Beaumont, 539 U.S. at 155, 157 (noting that National Right to Work, 459 U.S. 197 rejected the argument that the rationale for the corporate contribution ban "turns on the details of the corporate form," as opposed to similar organizational structures); Colo. Republicans, 533 U.S. at 456 & n.18, 457 (noting that "contribution limits would be eroded if inducement to circumvent them were enhanced").

The record contains sufficient evidence from which one could infer circumvention and perceive corruption. For example, these entities have become more active contributors since the corporate ban; LLC contributions more than doubled from 2.8% in the 2001 election to 6.2% in the 2005

2011 for rehearing en banc ("Citizens United never doubted the government's strong interest in preventing quid pro quo corruption or materially questioned the ability of corporations to serve as conduits for circumventing valid contributions limits."). As a result, the Court need not consider the extent to which the entity ban could have been justified by the anti-distortion and dissenting-shareholder rationales, which Citizens United rejected with respect to independent corporate expenditures.

[22] Since the entity ban is justified both by anti-corruption and anti-circumvention interests, and simply extends the already-existing corporate ban to other functionally similar entities, Green Party's requirement of a recent history of actual corruption does not apply.

43

election.[23] 2005 Election Report, at 121. Most compelling is the overwhelming percentage of contributions from such entities for incumbent candidates.[24] While the rise in contribution activity could be attributed to innocent causes, the grossly disproportionate support for candidates based not on ideology or voting record, but rather on their relative position of power and ability to return favors, creates the appearance of impropriety.

Entity contributions also undermine the CFA's goal of transparency, because they only have to be attributed to the partner or owner when they exceed $2,500. Committee Report, 29. Transparency is a particular problem for LLCs because many are involved in city business, especially land use, yet there are minimal disclosure requirements and often no publicly available information about the owners.[25] See 2005 Election Report, at 121; see also

[23] Following the ban on corporate contributions, organizational contributions rose from thirteen percent in 2001 to sixteen percent in 2005. 2005 Election Report, at 121.
[24] In the 2005 election, the average incumbent collected seventy-eight contributions from organizations, totaling $43,500, whereas challengers averaged only two contributions, totaling $1,800. Id. at 120.
[25] New York State Senator Daniel Squadron stated that the LLC loophole effectively means that "you don't have contribution limits." Gearty & Lesser, supra. The following examples demonstrate how easily campaign contribution can be bundled to circumvent limits: (1) a real estate developer, his wife, and two executives from his LLC all gave maximum contribution to the same incumbent candidate for City Council, see Interim Report, at 32-33; (2) the same developer, his immediate family, his LLC, and officers of his LLC contributed nearly $100,000 in the 2001 and 2005 City election cycles, id. at 32; (3) two real estate developers and their newly-formed LLC gave nearly ten times the amount of donations they had given in the past after initiating a particular project, id. at 35; (4) the owner of a parent company of the construction company that received a contract to build a major transportation hub in Manhattan, his children, and the owner of the parent company's marketing firm all gave significant contributions to an incumbent candidate for Borough President. See generally Doing Business Portal, http://www.nyc.gov/html/doingbiz/home.html (last visited Aug, 10, 2011). The lack of disclosure requirements for LLCs makes it especially difficult to track the extent of bundling that occurs.

Robert Gearty & Benjamin Lesser, <u>So-called 'LLCs' Enable Real Estate Giants to Give Huge Sums to Gov. Paterson, AG Andrew Cuomo</u>, N.Y. Daily News (Feb. 15, 2010), <u>available at</u> http://articles.nydailynews.com/2010-02-15/news/27056260_1_llc-money-limit-individual-donations-contributions (citing examples of how contributors evade the contribution limits by donating through LLCs—"the mother of all loopholes"—which are still permitted in New York State).

The pressing question here is whether the entity ban is closely drawn.[26] We hold that it is. The expansion of the corporate ban to include these entities does not render it overinclusive because, as noted, the legal distinctions between these entities and corporations do not make them less of a threat of corruption or circumvention.

For the reasons that justify the corporate contribution prohibition, therefore, the legislature permissibly determined that there is no room in

---

[26] The Court rejects Appellants' argument that the entity ban is underinclusive because it does not apply to contributions from doctors, lawyers, and Certified Public Accountants. The LLC, LLP, and partnership forms pose a risk of circumvention, not because of the nature of the profession for which they are organized, but because they create the opportunity for the same individuals to contribute up to the limits more than once–as an individual and again as an entity. Because Appellants do not provide any connection between these professions and the risk of corruption, this argument is unpersuasive. Moreover, their argument appears to be based on a misunderstanding of §3-703(1)(l)'s statement that the mere fact that a contributor's name is followed by a professional designation such as "M.D.," "Esq.," or "C.P.A.," does not cause the contribution to fall within the entity ban. This does not mean that a contribution from an LLC, LLP, or partnership consisting of doctors or lawyers would be exempt, but rather warns against the overapplication of the entity ban to individuals who hold such professional titles.

City campaigns for entity contributions. While limits may minimize circumvention and the appearance of corruption, the City is free to decide that these evils must be eliminated to ensure the public's faith in the electorate system.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court upholding the constitutionality of the contribution limits, non-matching provision, and entity ban.

Debra Ann Livingston, *Circuit Judge*, concurring in part and concurring in the judgment:

I join in Parts I, II and III.A of the majority opinion. I write separately as to Part III.B-E only to make clear my disagreement with the majority's conclusion that improper or undue influence is a form of corruption that may be addressed with closely drawn contribution limits. To the extent that this conclusion is one basis on which the majority upholds the special contribution limits and non-matching provisions that New York City's campaign finance law imposes on those "doing business" with the City, I respectfully disagree with its analysis.[1] I nevertheless conclude that these provisions pass constitutional muster pursuant to the Supreme Court's and this Court's precedents. Accordingly, I concur in the judgment as expressed in Part III.B-E.

$* * *$

Since the enactment of its Campaign Finance Act ("CFA") in 1988, New York City has imposed limits on the amount of money that may be contributed to a single candidate for public office in a given calendar year.[2] These generally applicable limits are \$4,950 to each candidate running for mayor, public advocate, or comptroller; \$3,850 to each candidate running for borough president; and \$2,750 to each candidate running for city council. N.Y.C. Admin.

---

[1] The majority relies principally on the Supreme Court's decision in *FEC v. Beaumont*, 539 U.S. 146 (2003), to uphold the City's ban on political contributions by partnerships, LLPs, and LLCs. To the extent it also relies on its conclusion regarding undue influence in reaching this determination, however, I similarly disagree.

[2] The relevant provision phrases the limits as ceilings on the amount each candidate may accept from a single contributor. N.Y.C. Admin. Code § 3-703(1)(f). The distinction is not material here.

Code §§ 3-703(1)(f), 3-703(7), 3-719(2)(b); Loprest Decl. ¶ 16. The appellants here take no issue with these generally applicable limits, but rather with subsequent limits enacted in 2007 and applicable only to individuals defined in the CFA as "doing business" with the City of New York. For natural persons who are classified as "doing business" with the City, significantly stricter limits apply: $400 to candidates for mayor, public advocate, or comptroller; $320 to candidates for borough president; and $250 to candidates for city council. N.Y.C. Admin. Code §§ 3-703(1-a), 3-719(2)(b); Loprest Decl. ¶ 39.

"Doing business" contributors include, *inter alia,* individuals with specified ownership or management roles in entities with valuable City contracts or grants, or relations with the City that concern the acquisition or disposition of real property.[3] Lobbyists are also included within the stricter contribution limits. N.Y.C. Admin. Code § 3-702(18)(a). Collective bargaining between the City and municipal labor organizations, however, does not constitute "doing

---

[3] The intricacies of the full statutory definition of "doing business" are not relevant here. Generally speaking, however, "doing business" includes any relationship with the City or its affiliated agencies involving: (1) contracts valued at $100,000 or more (except for emergency contracts or contracts procured through competitive bidding), N.Y.C. Admin. Code §§ 3-702(18)(a)(i), 3-703(1-a), 6-116.2(i)(3)(a); (2) the acquisition or disposition of real property, *id.* § 3-702(18)(a)(ii); (3) applications for approval for specified transactions involving office space, land-use plans, or zoning changes, *id.* § 3-702(18)(a)(iii); (4) certain concessions and franchises greater than or equal to $100,000, *id.* § 3-702(18)(a)(iv); (5) grants greater than or equal to $100,000, *id.* § 3-702(18)(a)(v); (6) economic development agreements, *id.* § 3-702(18)(a)(vi); and (7) contracts for investment of pension funds, *id.* § 3-702(18)(a)(vii). The "doing business" limits apply to "any chief executive officer, chief financial officer and/or chief operating officer of [an entity that has business dealings with the City or an affiliated agency] or persons serving in an equivalent capacity, any person employed in a senior managerial capacity regarding such entity, or any person with an interest in such entity which exceeds ten percent of the entity." *Id.* § 3-702(20); *see also id.* § 3-703(1-a). Generally speaking, an individual is considered to be "doing business" with the City at the time he or she has actual or pending dealings with the City until a specified period after the termination of dealings. N.Y.C. Admin. Code § 3-702(18)(b).

business." Simpson Decl. ¶ 8.  Moreover, the statutory text suggests that some neighborhood and community organizations and their members are not subject to the contribution limits even when these organizations engage in certain activities that would otherwise qualify as "doing business" with the City.[4] "Doing business" contributors are strictly limited in their contributions as compared to others: they may donate only approximately one twelfth as much to a candidate as those who are deemed not to be "doing business" with the City. Because the "doing business" contribution limits, unlike the regular limits, are not indexed for inflation, moreover, the disparity between these two sets of limits is only likely to increase over time.  *Compare* N.Y.C. Admin. Code §§ 3-703(1)(f), 3-703(7) *with id.* § 3-703(1-a).

The City also operates a public campaign financing program in which candidates for the various City offices specified above may choose to participate. In this program, the City matches the campaign contributions of most individuals to candidates who participate in the public funding program at a rate of six to one (with up to $1,050 of public funds available for matching per contributor per candidate).  *Id.* § 3-705(2)(a); Loprest Decl. ¶ 11.  Contributions from lobbyists or other persons "doing business" with the City, however, are not eligible for matching.[5]     N.Y.C.   Admin.   Code   §§   3-702(3)(g)-

---

[4] These activities involve zoning requests pursuant to N.Y.C. Charter §§ 197-c(a)(3) and 201.  *See* N.Y.C. Admin. Code §§ 3-702(18)(d), 3-702(20).

[5] Contributions from a lobbyist's spouse, domestic partner, and unemancipated children are also deemed ineligible for matching.  *Id.* § 3-702(16).  If the lobbyist is an organization, any officer or employee who engages in lobbying or works for a division of the organization that engages in lobbying, as well as his

(h), 3-703(1-a); Loprest Decl. ¶ 12.  Thus, an individual who does not fall into one of these two categories is entitled, for example, both to contribute $4,950 to a candidate for mayor *and*—if the candidate to whom the individual is making a contribution is participating in the City's public financing program and is otherwise eligible to receive matching funds—to have that contribution supplemented with $1,050 for a total contribution of $6,000.  The "doing business" contributor, in contrast, is limited to a contribution of $400 alone.

\*\*\*

I agree with the majority that the "doing business" contribution limitations in this case are subject to scrutiny for whether "they are closely drawn to serve a sufficiently important interest."  *Davis v. FEC*, 554 U.S. 724, 737 (2008) (internal quotation marks omitted); *see* Maj. Op. at 21.  The Supreme Court has repeatedly indicated that, while expenditure limitations are subject to strict scrutiny, which requires courts to assess whether the challenged "restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest,'" *Citizens United v. FEC*, 130 S. Ct. 876, 898 (2010) (quoting *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 464 (2007) (opinion of Roberts, C.J.)), contribution limits are subject to less searching scrutiny because campaign contributions "lie closer to the edges than to the core of political expression."  *FEC v. Beaumont*, 539 U.S. 146, 161 (2003); *see also Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 387-88

_____

or her spouse or domestic partner and unemancipated children, are excluded from the matching program.  *Id.*

(2000); *Buckley v. Valeo*, 424 U.S. 1, 25 (1976) (per curiam).  At the same time, with regard to contribution no less than expenditure limits, the First Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Buckley*, 424 U.S. at 15 (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)) (internal quotation mark omitted).  The scrutiny required by the First Amendment is thus both "exacting," *see id*. at 16; *Shrink Mo.*, 528 U.S. at 386, and "rigorous," *Buckley*, 424 U.S. at 29.

I likewise agree that the non-matching provisions here are similarly subject to "closely drawn" analysis.  *See* Maj. Op. at 38.  At least in the circumstances in this case, matching funds given to a candidate as a result of a contribution from a private donor are the functional equivalent of a contribution, so that limits on such funds are functionally equivalent to contribution limits. *See FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 456 (2001) (determining that "party coordinated spending [is] the functional equivalent of contributions," *id.* at 447, and accordingly applying "scrutiny appropriate for a contribution limit," *id.* at 456).  Therefore, this Court must analyze both sets of provisions to determine whether "they are closely drawn to serve a sufficiently important interest." *Davis*, 554 U.S. at 737 (internal quotation marks omitted). The City bears the burden of proof in this inquiry.  *Shrink Mo.*, 528 U.S. at 387-88.

\*\*\*

I part ways with the majority, not in our shared conclusion as to the constitutionality of the provisions here, but in determining what counts as a "sufficiently important interest" in relation to which the provisions must be judged. Pursuant to the Supreme Court's decision in *Buckley*, preventing "the actuality and appearance of corruption" is such an interest. *Buckley*, 424 U.S. at 26. The majority, however, goes beyond *Buckley* in concluding that "improper or undue influence . . . qualifies as a form of corruption" which may be combated via closely drawn contribution limits. Maj. Op. at 22-23 (emphases omitted). Because recent decisions by the Supreme Court and this Court clearly foreclose this latter determination, I respectfully disagree with it.

In *Citizens United*, the Supreme Court unequivocally stated that when *Buckley* identified the prevention of corruption or its appearance as "a sufficiently important governmental interest" to render closely drawn contribution limits acceptable under the First Amendment, "*that interest was limited to quid pro quo corruption.*" 130 S. Ct. at 909 (emphasis added).[6] The Court recognized that favoritism and influence, unlike corruption, are unavoidable in representative politics, in which a legitimate and substantial

---

[6] Thus, contrary to the majority's contention, *see* Maj. Op. at 23 n.13, the Court's conclusion in *Citizens United* cannot be confined to the context of expenditure limits, even though *Citizens United* itself involved such limits, *see* 130 S. Ct. at 908. Indeed, *Buckley*'s very determination that preventing *quid pro quo* corruption and its appearance (but not real or perceived influence) may justify trenching on First Amendment freedoms took place in the contribution, not expenditure, context. *See Buckley*, 424 U.S. at 26-27; *see also Citizens United*, 130 S. Ct. at 908 ("In *Buckley*, the Court found this interest [in preventing corruption and its appearance] 'sufficiently important' to allow limits on contributions but did not extend that reasoning to expenditure limits.").

reason for casting a ballot or making a contribution "is that the candidate will respond by producing those political outcomes the supporter favors." *Id.* at 910 (quoting *McConnell v. FEC*, 540 U.S. 93, 297 (2003) (Kennedy, J., concurring in the judgment in part and dissenting in part), *overruled in part on other grounds by Citizens United*, 130 S. Ct. 876). In a democracy premised on responsiveness, the Court said, the mere fact "that speakers may have influence over or access to elected officials does not mean that these officials are corrupt." *Id.* And importantly, reliance on a generic influence theory to justify limiting political speech is, itself, dangerous—"at odds with standard First Amendment analyses because it is unbounded and susceptible to no limiting principle." *Id.* (*quoting McConnell*, 540 U.S. at 296 (Kennedy, *J.*, concurring in the judgment in part and dissenting in part)) (internal quotation mark omitted).

Even if it were not clear after *Citizens United* (as, in fact, it is) that First Amendment freedoms may not be curtailed to address mere influence or the perception of such influence in the political arena, any question about whether *Citizens United*'s pronouncement applies in the context of contribution limits was resolved by this Court in *Green Party of Connecticut v. Garfield*, 616 F.3d 189 (2d Cir. 2010). There, the Court addressed the validity of Connecticut's bans on campaign contributions to candidates for state office from state contractors and lobbyists. *See id.* at 194. Some of the evidence before the *Green Party* panel "suggest[ed] that many members of the public generally distrust lobbyists and

the 'special attention' they are believed to receive from elected officials." *Id.* at 206. This Court said there that "influence and access," without more, "are not sinister in nature," but are part of representative government. 616 F.3d at 207. Citing *Citizens United*, the Court held that "evidence demonstrating that lobbyist contributions give rise to an appearance of 'influence' has no bearing on whether the . . . ban on lobbyist contributions is closely drawn to the state's anticorruption interest." *Id.* at 207 (citation omitted).

The majority distinguishes between "mere influence or access to elected officials" and "*improper* or *undue* influence," suggesting that while the former may be an insufficient basis on which to limit First Amendment freedoms, the latter is not. Maj. Op. at 22-23 & n.14. To be clear, if "improper or undue influence" means nothing more than an appearance of *quid pro quo* corruption arising, as *Buckley* put it, "from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions," 424 U.S. at 27, I have no quibble with the majority's position. *Citizens United,* however, clearly "rejected a claimed governmental interest 'in equalizing the relative ability of individuals and groups to influence the outcome of elections,' and rejected the concern over the 'undue influence' of money serving as a form of corruption that justifies regulation." Samuel Issacharoff, *On Political Corruption*, 124 Harv. L. Rev. 118, 125-26 (2010) (quoting *Citizens United*, 130 S. Ct. at 904). Thus,

contribution limits are acceptable *only* when they are closely drawn to tackle real or apparent *quid pro quo* corruption.

This is no unimportant point. By requiring that a regulation suppressing political speech and association be closely drawn to address the threat of *quid pro quo* corruption (or the perception that large contributors will secure their *quid*), courts strive to draw a principled constitutional line—a line that permits legislatures to address the significant danger corruption poses to representative democracy while it vigorously protects political speech by ensuring that First Amendment principles are enforced. The generic influence theory is, in contrast—and as the *Citizens United* Court recognized—"susceptible to no limiting principle." *Citizens United*, 130 S. Ct. at 910 (quoting *McConnell*, 540 U.S. at 296 (Kennedy, J., concurring in the judgment in part and dissenting in part)) (internal quotation mark omitted). Today it disfavors "doing business" contributors. But all those who seek to influence politicians are vulnerable to being perceived as having influence that is "undue." If demonstrating such a perception is enough to bear the legislature's First Amendment burden in justifying restrictions on speech and association, that burden is light indeed.

\* \* \*

Focusing properly only on the prevention of *quid pro quo* corruption or its appearance, I next conclude that the New York City restrictions at issue are "closely drawn" to serve the interest which justifies the limitations they place on

First Amendment rights. Because I find this question more difficult than my colleagues, however, I write briefly to explain my position.

The Supreme Court has not yet addressed the First Amendment implications of campaign finance laws that impose stricter contribution limits on the political contributions of some individuals who are seen to pose a particularly serious threat to the government's interest in preventing the appearance or actuality of *quid pro quo* corruption. Federal law has long prohibited government contractors from making contributions to "any political party, committee, or candidate for public office or to any person for any political purpose or use" while these contractors are seeking or performing pursuant to a contract. The relevant provision, however—2 U.S.C. § 441c—has not come before the Court. This Court in *Green Party* upheld a contribution ban imposed on Connecticut contractors and related individuals in the wake of a corruption scandal, 616 F.3d at 205, but invalidated a ban imposed on lobbyists and their families, finding insufficient evidence to demonstrate that all such contributions give rise to an appearance of corruption, *id.* at 206-07. Other courts have upheld laws limiting in various ways the campaign contributions of casino operators, *see Casino Ass'n of La. v. State ex rel. Foster*, 820 So.2d 494 (La. 2002), lobbyists, *see N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705 (4th Cir. 1999), and municipal bond traders, *see Blount v. SEC*, 61 F.3d 938 (D.C. Cir. 1995). But the case law

is relatively sparse, and no case has addressed a set of limits precisely analogous to those here.

The law at issue, to survive First Amendment scrutiny, must both serve the City's anticorruption interest and be "closely drawn" to achieve this interest. There is reason to question whether New York City's "doing business" restrictions satisfy this test. Thousands of New Yorkers are severely restricted in the amounts they may contribute or have matched as a result of these restrictions, some by virtue of no more than a family relationship or their leadership positions in institutions such as the Metropolitan Museum of Art or the Cathedral Church of St. John the Divine. *See* Joseph Goldstein, *City Blacklist Limits Giving by 12,000*, N.Y. Sun, August 14, 2008, http://www.nysun.com/new-york/city-blacklist-limits-giving-by-12000/83868. By contrast, other New Yorkers who would qualify as "doing business" with the City under any ordinary understanding of the term (such as those leading municipal labor unions) are subject only to the higher limits. Furthermore, New York's law restricts "doing business" contributions to campaigns for specified City offices regardless of whether the particular office at stake plays any role in the business relationship that is the trigger for the stricter limits.[7] Despite the magnitude of the disparity between contributions permitted from the disfavored "doing

---

[7] For instance, the owner of a small apartment complex with an application pursuant to N.Y.C. Charter § 197-c pending before one of New York City's fifty-nine community boards is tightly restricted in the amount she may contribute to a candidate running for comptroller, even though the comptroller plays no role in the approval process outlined in section 197-c. *See* Karnovsky Decl. ¶¶ 8-27.

business" contributors and the rest of the polity, moreover, in terms of the amounts they may contribute, there is reason to question whether this stark difference in treatment is in fact necessary—whether the new limits are more effective at preventing actual or apparent corruption than the generally applicable contribution limits that preceded them. Indeed, there is little record evidence of *any quid pro quo* corruption involving a New York City official since the enactment of the generally applicable limits over 20 years ago.[8]

The majority relies in part on the "objective[] reasonable[ness]" of "the connection between money and municipal action" to uphold the strict limits New York City's law places upon the free speech and associational rights of those "doing business." Maj. Op. at 31. The Supreme Court has stated, however, that "[w]hen the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural." *Turner Broad. Sys, Inc. v. FCC*, 512 U.S. 622, 664 (1994) (plurality opinion) (citation omitted) (internal quotation marks omitted); *see also Colo. Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 618 (1996) (opinion of Breyer, J.) (applying *Turner* in the campaign finance context); *Shrink Mo.*, 528 U.S. at 392 ("We have never accepted mere

---

[8] In fact, the Charter Revision Commission ("CRC") specifically noted in 1998 that since the City enacted the general limits prohibiting the large contributions of the past, "[g]enerally there is no evidence that . . . campaign contributions [by those "doing business" with the City] actually influence the award of a particular contract or passage of a bill." Pines Decl., Ex. F, Report of the N.Y.C. Charter Revision Comm'n at 19.

conjecture as adequate to carry a First Amendment burden . . . .”). Requiring the City to point to evidence demonstrating its anticorruption concern, moreover, does not amount to “giving every corruptor at least one chance to corrupt.” Maj. Op. at 27. Reports of recent scandals are one form of evidence that tends to show corruption or its appearance, *see, e.g.*, *Green Party*, 616 F.3d at 200, but so do other forms of evidence, including, *inter alia*, testimony by those familiar with the political life of the community, *see Shrink Mo.*, 528 U.S. at 393, and surveys of the populace, *see id.* at 394.

On balance, however, and upon a close examination of the record, I agree with the majority’s conclusion that the City has adequately demonstrated that its “doing business” contribution limits address a real and not a conjectural corruption concern. First, a report prepared for the Campaign Finance Board (“CFB”) in 2006 reported that those “doing business” with the City tend to give larger contributions to candidates (albeit within the 1988 contribution limits) as compared to those lacking such business relationships. *See* Loprest Decl., Ex. A, Municipal Campaign Finance and “Pay-to-Play”: An Analysis of *Doing Business* Contributions in New York City (“Pay-to-Play Report”) at 12.[9] The Report cites to specific instances of large donations by real estate developers, in particular, during the very period when matters in which these developers had

---

[9] The Pay-to-Play Report reaches this conclusion using a different definition than the one eventually adopted by the City, including only “[f]irms or individuals who are principals of firms who have contracts with the City valued at $100,000 or more[,] and/or . . . [r]egistered lobbyists and lobbyist clients.” *Id.* at 4. However, the Report’s conclusions still provide evidence in support of the lowered campaign contributions, since many of the contributors captured under the Report’s definition would also fall within the CFA’s definition of those “doing business” with the City.

an interest were pending before City authorities. *See id.* at 31-37. Even without evidence that such contributions were made in exchange for a *quid*, they could well foster the appearance of corruption in City politics. *See Buckley*, 424 U.S. at 27 ("Of almost equal concern as the danger of actual quid pro quo arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions."). Also significant is the fact that New York City voters in 1998 passed a referendum altering the New York City Charter to "require[e] disclosure and regulation of contributions by those doing business with the City of New York." LaRue Decl., Ex. B, Charter Revision Comm'n's Proposal on Campaign Fin. Reform. The Supreme Court has instructed that such votes may properly be taken as evidence of a perception of corruption that legislatures may legitimately address. *See Shrink Missouri*, 528 U.S. at 394.

Granted, the record also contains troubling indications that at least some of the proponents of the "doing business" limits may have aimed at curtailing the *influence* of "doing business" contributors as much as corruption or its appearance. *See, e.g.*, Pines Decl., Ex. F. Report of the New York City Charter Revision Comm'n at 19 (noting that donations by "doing business" contributors "at a minimum . . . create the perception that [such] donors have the opportunity and desire to exercise undue influence over elected officials"). The anticorruption interest pressed by the City in justification of the new

contribution limits, however, is borne out in the record. And in these circumstances, the Supreme Court's precedents regarding contribution limits require the conclusion that New York City's "doing business" restrictions are closely drawn, despite the lack of a perfect fit between these restrictions and the threat of real or perceived corruption. Indeed, while the Supreme Court has never had occasion to address a campaign finance scheme involving targeted, variable limits as are at issue here, it has consistently counseled that, outside narrow circumstances, *see Randall v. Sorrell*, 548 U.S. 230, 248-62 (2006), deference is owed to legislative determinations regarding campaign contribution restrictions. *See, e.g., McConnell*, 540 U.S. at 137. Judged by this precedent, New York City's "doing business" contribution limits fall within—although perhaps barely within—the bounds of the Supreme Court's contribution limits jurisprudence.

First, those "doing business" within the meaning of the law are held to the stricter contribution limits only while doing business and for a short period thereafter—strongly suggesting that the law is aimed at the particular danger of real or apparent *quid pro quo* arrangements, rather than mere influence. *See McConnell*, 540 U.S. at 167 (noting that certain "regulations . . . are reasonably tailored, with various temporal . . . limitations designed to focus the regulations on the important anticorruption interests to be served"). The Supreme Court has said, moreover, that contribution *limits*, as opposed to bans, "involve[] little

direct restraint on [a contributor's] political communication, for [they] permit[] the symbolic expression of support evidenced by a contribution" and do not otherwise "infringe the contributor's freedom to discuss candidates and issues." *Buckley*, 424 U.S. at 21.[10] While it seems to me an open question whether the City could not achieve its anticorruption goals with less severe restrictions on "doing business" contributors, moreover, the Supreme Court has instructed that courts have no "scalpel to probe" whether a legislative body has selected the precisely optimal balance of free speech and security against corruption. *Id.* at 30. *Cf. FEC v. Nat'l Right to Work Comm.*, 459 U.S. 197, 210 (1982) ("Nor will we second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared."). As to the non-matching restriction placed upon contributions made by the family members or work associates of individuals engaged in lobbying, the majority properly cites to record evidence of circumvention. *See* Maj. Op. at 41 n.20. And finally, while I continue to be troubled that the limits apply even as to campaigns for offices in which the officeholder may have no direct authority with regard to the particular business relationship at issue, this feature of the "doing business" restrictions is not unique to the CFA. *See* 2 U.S.C. § 441c. In any event, appellants have waived this argument by including it only in their reply brief. *See Norton v.*

---

[10] As the majority opinion notes, appellants make no argument that the "doing business" restrictions prevent candidates from amassing sufficient funds to run effective campaigns, as the unconstitutional Vermont law in *Randall*, 548 U.S. 230, did. *See id.* at 248-62; *see also Green Party*, 616 F.3d at 201.

*Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998).

\* \* \*

Despite some disagreement with the majority in terms of the analysis here, I share much common ground with the majority opinion. I agree that the ban on contributions by LLCs, LLPs, and partnerships must be upheld pursuant to *FEC v. Beaumont,* 539 U.S. 146, which the Supreme Court declined to overrule in *Citizens United.* More fundamentally, I agree that individual citizens, not their government, should determine who may speak and to whose speech others will listen. *See* Maj. Op. at 14-15. The Supreme Court has recognized that "[l]eveling electoral opportunities [by restricting political speech] means making and implementing judgments about which [candidates'] strengths should be permitted to contribute to the outcome of an election." *Davis*, 554 U.S. at 742. The First Amendment, however, "[p]remised on mistrust of governmental power . . . stands against attempts to disfavor certain subjects or viewpoints," as well as to draw distinctions among speakers. *Citizens United*, 130 S. Ct. at 898. This is why "the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." *Buckley*, 424 U.S. at 48-49. While I disagree with the majority's analysis in the respects noted here, neither the majority opinion nor this concurrence casts doubt on the paramount importance of upholding the freedom of individuals to speak as they wish about

the political life of the nation or of their communities.  It is in the knowledge of this fundamental agreement that I respectfully concur as to Parts I, II and III.A, and concur in the judgment as to Part III.B-E.

CALABRESI, J., concurring:

*As Jesus looked up, he saw the rich putting their gifts into the temple treasury. He also saw a poor widow put in two very small copper coins. "Truly I tell you," he said, "this poor widow has put in more than all the others. All these people gave their gifts out of their wealth; but she out of her poverty put in all she had to live on."*

Luke 21:1-4.

I join the majority opinion because it properly describes and follows the current law of campaign finance. But all is not well with this law, and I believe it appropriate to state in a judicial opinion why I think this is so.

Judge Crotty has performed a careful analysis of corruption (actual and its appearance), and only of corruption, as a ground for upholding the regulations at issue in this case.[1] His is the necessary analysis under Supreme Court case law. The High Court has told us that the First Amendment protects the right to speak through the use of money, but that the existence of this right does not prevent governments from enacting campaign finance regulations in furtherance of their interest in limiting actual or apparent corruption. *McConnell v. FEC*, 540 U.S. 93, 143 (2003) ("Our cases have made clear that the prevention of corruption or its appearance constitutes a sufficiently important interest to justify political contribution limits."). At the same time, the Court has rejected the idea that governments may, by campaign finance regulations, pursue the separate interest in what it has rather derisively called "leveling the playing field." *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2825-26 (2011). That is, under current Supreme Court doctrine, governments cannot defend campaign finance regulations on the ground that such regulations take into account and respond to the different

---

[1] Of course, the majority opinion also discusses the state's "anticircumvention" interest in connection with the entity ban, but that interest is largely derivative of the state's "anticorruption" interest.

1

capacities of the rich and the poor to speak through money; legislatures—the Court has indicated—have *no* role to play with respect to that. It is with this position that I wish to take issue here.[2]

I agree completely with the Supreme Court that the First Amendment protects each person's right to express political beliefs through money. Where I disagree with the Court is in its repeated insistence that any recognition of the "level playing field" interest (elsewhere referred to as the "antidistortion interest," *Citizens United v. FEC*, 130 S. Ct. 876, 903 (2010)) is inconsistent with this right. To the contrary, the antidistortion interest promotes this right in two important ways. First, it prevents some speakers from drowning out the speech of others. And second, it safeguards something of fundamental First Amendment importance—the ability to have one's protected expression indicate the intensity of one's political beliefs. These values, moreover, have not gone unrecognized in underlying First Amendment jurisprudence.

The first benefit of antidistortion measures is not difficult to see. If an external factor, such as wealth, allows some individuals to communicate their political views too powerfully, then persons who lack wealth may, for all intents and purposes, be excluded from the democratic dialogue. In much the same way that anti-noise ordinances help to prevent megaphone users from drowning out all others in the public square, contribution limits can serve to prevent the wealthiest donors from rendering all other donors irrelevant—from, in effect, silencing them. For an articulation of this concern—*i.e.*, that, without regulation, the rich would be able to use their wealth to overwhelm the voices of the poor—one need look no further than the Supreme Court's decision in *Red Lion Broadcasting Co. v. FCC*, where, in upholding the FCC's "fairness

---

[2] As the case before us involves contribution restrictions, I will speak primarily of such restrictions here. But much of what I say applies with equal force to restrictions on independent expenditures.

doctrine," the High Court long ago explained that, without the rule in place, "station owners and a few networks would have unfettered power to make time available only to the highest bidders" and thereby broadcast only those bidders' political views. *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 392 (1969); *see also id.* at 387 ("Just as the Government may limit the use of sound-amplifying equipment potentially so noisy that it drowns out civilized private speech, so may the Government limit the use of broadcast equipment. The right of free speech of a broadcaster, the user of a sound truck, or any other individual does not embrace a right to snuff out the free speech of others.").[3] The same is true of contribution limits: Without restrictions on the size of campaign contributions, the wealthy could flood the campaign coffers of their preferred political candidates, rendering all other contributions negligible by comparison. Contribution limits, like noise ordinances, still allow those who have the capacity a full opportunity to make their speech widely heard—the wealthy remain able to express their views

---

[3] The fact that the FCC no longer enforces the fairness doctrine is not relevant to the Court's constitutional analysis in *Red Lion*. Indeed, what it shows is that bodies other than courts (administrative and legislative bodies) are perfectly capable of taking into account the facts and circumstances that determine what kinds of speech restrictions are inappropriate, undesirable, or even constitutionally problematic. *Cf. Syracuse Peace Council v. FCC*, 867 F.2d 654, 661 (D.C. Cir. 1989) (upholding the FCC's determination that the fairness doctrine no longer served the public interest, and noting, *inter alia*, the FCC's conclusions that the doctrine chilled "the expression of unorthodox or 'fringe' views on controversial issues" and that the doctrine was no longer needed in light of the "dramatic increase in broadcasting outlets since [the year of its implementation]"). In contrast with the nuanced handling of the issues by the FCC as upheld by the D.C. Circuit, courts acting on their own and indulging in undemocratic decisionmaking create the danger not only of wrong solutions to difficult constitutional problems, but also of *rigid* answers to questions that by their nature demand flexible, adaptive, and democratically informed responses.

forcefully through money—but such limits make sure that this is done only in ways that leave room for everyone else to do the same.[4]

The second benefit of antidistortion measures is perhaps more subtle, but of no less importance: it relates to the ability of all persons, rich and poor, to express the intensity of their feelings. In many circumstances, the intensity of a speaker's expression tells us much about the intensity of that speaker's beliefs. Polite applause conveys less enthusiasm than a shouted "Bravo!" Passing criticisms convey weaker disagreement than passionate harangues. And, of course, the tone of a judicial opinion provides some indication of how bleakly a judge views a certain area of the law. But where speech takes the form of a monetary expenditure, the link between intensity of beliefs and intensity of expression, as measured by the amount contributed, can too easily break down. This is a result of the unequal distribution of wealth, which makes the amount of money an individual spends on behalf of a political cause an unreliable measure of the intensity and depth of that individual's support for the cause. "In other words, and crucially, a large contribution by a person of great means may influence an election enormously, and yet may represent a far lesser intensity of desire than a pittance given by a poor person." *Landell v. Sorrell*, 406 F.3d 159, 161 (2d Cir. 2005) (Calabresi, J., concurring in the denial of rehearing en banc), *rev'd sub nom. Randall v. Sorrell*, 548 U.S. 230 (2006).

To return to the example of the megaphone in the public square, the problem with its loudness is not just that it drowns out the voices of others, but also that it *misrepresents*, to an outside observer, the relative intensity of the speaker's views. That is, even if the megaphone

---

[4] The same would be true of payments by the government that match or otherwise increase the contributions of the poor; that is, rather than putting in noise ordinances, the government might prefer to make megaphones widely available.

user cares little about the issue being discussed, his voice gets heard above all others, while the voices (and intensity of feelings) of those who care passionately about the issue (and shout their beliefs at the top of their lungs) seem small in comparison. The one speaker's relative loudness—along with the other speakers' relative softness—obscures the depth of each speaker's views, thereby degrading the communicative value of everyone's message.

The foregoing example may seem fanciful, but money is not. And there is perhaps no greater a distortive influence on the intensity of expression than wealth differences. The wider the economic disparities in a democratic society, the more difficult it becomes to convey, with financial donations, the intensity of one's political beliefs. People who care a little will, if they are rich, still give a lot. People who care a lot must, if they are poor, give only a little. Jesus's comment about the rich donors and the poor widow says it all. Today, the amount of an individual's campaign contribution reflects the strength of that individual's preferences far less than it does the size of his wallet. In this sense, all political donations—by rich and poor alike—lose a crucially important aspect of their communicative value when campaign funds are unrestricted. And that is a problem of profound First Amendment significance.

It is no small irony, then, that in refusing to recognize the existence of a state interest in "leveling the playing field"—an interest which prior Supreme Court precedents had suggested was compelling, and certainly is at least legitimate—the Court purports to safeguard "the 'unfettered interchange of ideas.'" *Bennett*, 131 S. Ct. at 2826 (quoting *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam)). Far from standing in the way of this ideal, the antidistortion interest is vital to its fulfillment. Left unregulated, the "distorting effects of immense aggregations of wealth," *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990), *overruled by Citizens United*, 130 S. Ct. at 913, will garble the political debate, trumpeting

5

voices that would otherwise be muted and muting voices that would otherwise be trumpeted.

Profound wealth differences, in short, make it difficult for speakers to express (and listeners to discern) the true depths of their feelings. And because wealth inequalities are inevitable, and indeed, many would say are desirable in their creation of incentives, the only way to ensure a truly "unfettered interchange of ideas"—an interchange, that is, where each voice is heard in reasonable proportion to the intensity of the beliefs it expresses—is to give the government some freedom to mitigate the fettering impact of these inequalities.[5]

Indeed, if the Court were correct that the level playing field interest does not provide an appropriate reason for regulating campaign contributions, then it becomes difficult to see why the First Amendment does not give individuals the right to pay other individuals to vote for candidates in elections. Such a practice need not raise the specter of *quid pro quo* corruption; one might still buy votes on behalf of one's preferred candidate even if one could ask nothing from the candidate in return. The critical problem with vote-buying is not corruption; it is rather that allowing the practice would give the wealthiest individuals a huge effect over political elections, making even their relatively minor preferences matter immensely and the possibly intense preferences of the poor matter not much at all. This same concern, of course, explains why a state has a valid interest in leveling the playing field with respect to campaign contributions. Yet, curiously, the Supreme Court seems to accept the validity of vote-buying regulations without

---

[5] Moreover, to the extent that campaign contributions cannot be regulated so as to leave them free to reflect intensity of feeling, the pressure for greater economic equality will increase, and this may be detrimental to those efficiencies that flow from an unequal distribution of wealth. Put another way, if campaign finance doctrine fails to recognize the value of a level playing field in the political realm, there may arise stronger pressures to create a more level playing field in the economy as a whole. The effect of such pressures on incentives and on overall economic wellbeing I leave to others to evaluate.

hesitation, *cf. Brown v. Hartlage*, 456 U.S. 45, 54-55 (1982), while it refuses to accept the validity of the antidistortion interest.

I am not suggesting that expressing the intensity of one's views is the only thing that matters in campaign finance doctrine, or in election law more generally.[6] Nor am I suggesting that the playing field must be fully level. This is an area of law in which many considerations come into play, some of which, such as the dangers of *quid pro quo* corruption, counsel in favor of state regulation, while others, such as the dangers of incumbent entrenchment, counsel against. What specific limitations are and are not appropriate is not for me to say or even to suggest as a judge.[7] They are not the kinds of things courts are suited to decide but instead constitute matters as to which legislative judgment is crucial. What this in turn means is simply stated: So long as the Supreme Court refuses to recognize the importance of the antidistortion interest, and its connection to the ability to express the intensity of one's feelings, the Court will be ignoring a variable of critical constitutional importance and excluding the most important players—democratically elected legislatures—from their proper role in regard to that variable.

---

[6] If it were, we might expect the ballot to be structured so as to give maximum effect to preference intensity, through such devices as "cumulative voting" or "single-transferrable voting." *See* Samuel Issacharoff, Pamela S. Karlan & Richard H. Pildes, The Law of Democracy: Legal Structure of the Political Process 1137-75 (3d ed. 2007). Although some jurisdictions have experimented with cumulative voting models, *see id.* at 1163-67, 1172-75, most still adhere to the traditional model, in which each individual—regardless of the strength of her preferences—may cast one (and only one) vote for one (and only one) candidate per electoral contest. The infrequent use of these alternative voting systems does not, of course, demonstrate any lack of importance to the expression of preference intensity. It suggests only that, in the context of elections, the need to recognize this value is balanced against other considerations.

[7] In my life as a scholar, I have proposed some solutions to this problem. *See, e.g.*, Philip Bobbit & Guido Calabresi, Tragic Choices 98-117 (1978) (discussing wealth-distribution-neutral markets); Guido Calabresi, Inaugural Lecture of the Academic Year of the International University College (IUC) of Torino: Merit Goods, the Commons, and Their Significance for Justice, Efficiency, and Equality (May 19, 2011) (video available at http://www.youtube.com/watch?v=iQnLakWMycM).

*     *     *

What is at stake here—what everyone knows is at stake here—is what was recognized and expressed so directly, succinctly, and powerfully in the story of the widow's mite. The ability to express one's feelings with all the intensity that one has—and to be heard—is a central element of the right to speak freely. It is, I believe, something that is so fundamental that sooner or later it is going to be recognized. Whether this will happen through a constitutional amendment or through changes in Supreme Court doctrine, I do not know. But it will happen. Rejection of it is as flawed as was the rejection of the concept of one-person-one-vote. And just as constitutional law eventually came to embrace that concept, so too will it come to accept the importance of the antidistortion interest in the law of campaign finance.

It is with that faith in a better future, along with an understanding of the requirements of our flawed present, that I join the majority opinion.